IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| Melanie Lawson, | ) |
| | ) Civil Action No. 7:13-1050-TMC |
| Plaintiff, | ) |
| | ) |
| v. | ) **ORDER** |
| | ) |
| Union County Clerk of Court William F. "Freddie" Gault; William F. "Freddie" Gault, Individually, | ) |
| | ) |
| Defendants. | ) |

The plaintiff, Melanie Lawson ("Lawson"), brought this action against her former employer, William F. "Freddie" Gault ("Gault"), the Union County Clerk of Court, in his individual and official capacities, pursuant to 42 U.S.C. § 1983. This matter is before the court on the defendants' motion for summary judgment or, in the alternative, to dismiss (ECF No. 26). The parties have fully briefed that motion (ECF Nos. 31, 32), and the court heard oral argument regarding the relevant issues on May 15, 2014.

The court issued its order in this case on August 14, 2014. (ECF No. 37). Thereafter, the defendants moved for this court to reconsider its order. (ECF No. 39). The parties fully briefed the motion to reconsider the opinion, and the court heard oral arguments on October 30, 2014. The court grants the motion to reconsider, and issues this order, which supersedes the court's order dated August 14, 2014.

**BACKGROUND**

The following is a summary of facts as stipulated to by the parties (*see* ECF No. 25) and gleaned from the record. From 1992 until November 14, 2012, Lawson was employed by the Union County Clerk of Court. In 2009, the Governor appointed Gault as clerk of court,

1

following the former clerk's resignation. At the time Gault was appointed, Lawson was a senior employee in the Family Court/Child Support division of the clerk's office. Shortly after his appointment, Gault hired a part-time employee to conduct bank reconciliations and formally appointed several staff members, including Lawson, to serve as deputy clerks of court. With the additional hire, the clerk's office had a full-time staff of ten and a part-time staff of one. However, in Union County, Lawson and three other employees worked in a building known as "the annex," separate and apart from Gault's office located in the courthouse. (*See* Gault dep., ECF No. 26-4, p. 4.)

In March 2012, Lawson informed Gault that she intended to run in the June 2012 democratic primary for the office of Union County Clerk of Court. On March 30, 2012, after Lawson paid her filing fee and registered to run, Gault placed her on unpaid leave of absence. Lawson spent the next several months campaigning, touting her decades of experience and other qualifications. Throughout this period, Lawson did not involve anyone in the clerk's office in her campaign efforts. In the November 2012 general election, Lawson ran as a petition candidate against Gault, the Republican candidate, for Union County Clerk of Court. Gault won the election.

After the election, Gault asked to speak with Lawson. And, on November 14, 2012, Lawson met with Gault, who informed her that, in the best interest of the office, he was terminating her employment.

**LEGAL STANDARD**

Summary judgment is appropriate if, after reviewing the entire record in a case, the court is satisfied that no genuine issues of material fact exist and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue of fact is "genuine" if the evidence

is such that a reasonable jury could return a verdict for the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Issues of fact are "material" only if establishment of such facts might affect the outcome of the lawsuit under the governing substantive law. *Id.*

## DISCUSSION

In moving for summary judgment, Gault asserts that (1) Lawson has failed to identify a constitutional right on which to base her § 1983 claim; (2) if Lawson has stated a cognizable constitutional violation, the right was not clearly established at the time of the violation and Gault is entitled to qualified immunity as to all claims against him in his individual capacity; and (3) Gault is entitled to Eleventh Amendment immunity as to all claims against him in his official capacity.

The First Amendment protects freedom of speech, freedom of association, and "the right to be free from retaliation by a public official for the exercise of [those] right[s]." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). "Although government employees do not forfeit their constitutional rights at work, it is well established 'that the government may impose certain restraints on its employees' speech and take action against them that would be unconstitutional if applied to the general public.'" *Bland v. Roberts*, 730 F.3d 368, 373 (4th Cir. 2013) (quoting *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011)). Importantly, public officers and employees do not have a First Amendment right to simultaneously run for elective office and maintain public employment. *See Clements v. Fashing*, 457 U.S. 957 (1982); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973); *U.S. Civil Svc. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548 (1973).

Courts utilize two primary frameworks for analyzing a public employee's termination for exercising a First Amendment right. If a public employee is terminated for speaking as a private

citizen on a matter of public concern, then the court balances that employee's right against any government interest in efficient operation. *See Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *McVey v. Stacy*, 157 F.3d 271 (4th Cir. 1993). And, if a public employee is terminated for her political beliefs or affiliation, the court turns to the principles established in *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980). Under *Elrod* and *Branti*, an employer may not fire a public employee solely because of the employee's political affiliation, unless that employee occupies a policymaking position.

There is some debate between the parties over the exact First Amendment right Lawson is asserting. In her second amended complaint, Lawson alleges that Gault "terminated [her] from her employment because of her exercise of her right to run for public office thereby violating [Lawson's] First Amendment rights." (ECF No. 16, ¶¶ 11-12.) However, in her response to Gault's motion for summary judgment, Lawson frames the right as one to "free speech and to be free from retaliation by a public official for exercise of that right." (ECF No. 31-1, p. 16.) Gault, on the other hand, views the right more narrowly as a public employee's right to run for public office against her boss and to retain her position after the election. (*See* ECF No. 26-2, p. 9.) At the hearing, the court sought to clarify this issue and asked Lawson's counsel if the complaint was based on a right to freedom of speech or political affiliation. Counsel responded that Lawson's claim is that Gault violated her right to free speech.[1]

The parties' differences in framing the exact right at issue here is not surprising; as noted in the parties' briefs, courts across the country addressing similar facts have come down on all sides of the First Amendment coin. As a result, "[p]recedent in the area of constitutional

---

[1] In addition, on June 19, 2014, Lawson's counsel filed a letter to the court attaching the Supreme Court's recent decision in *Lane v. Franks*, 134 S. Ct. 2369 (2014). (ECF No. 35.) Counsel submitted that *Lane* more clearly defines *Pickering*'s second prong. However, because the court does not explicitly reach *Pickering*'s second prong, it does not find *Lane* persuasive.

4

protection for candidacy can be best described as a legal morass." *Randall v. Scott*, 610 F.3d 701, 710 (11th Cir. 2010).

In analyzing very similar facts, the Eleventh Circuit has proceeded under *Elrod* and *Branti*, finding the appropriate standard to be "a balancing test between a discharged employee's right to [candidacy] and the state's interest in office loyalty." *Id.* at 713. Further, in balancing these interests, the Eleventh Circuit has observed that "interest in candidacy, and expression of political views without interference from state officials who wish to discourage that interest and expression, lies at the core of values protected by the First Amendment." *Id.* Based on this reasoning, the court has held that "an elected official may dismiss an immediate subordinate for opposing her in an election without violating the First Amendment if the subordinate, under state or local law, has the same duties and powers as the elected official." *Underwood v. Harkins*, 698 F.3d 1335, 1343 (11th Cir. 2012). However, the court was careful to note that these were not cases in which an employee was terminated for things she said during an election, noting that those cases would fall under *Pickering* and *Connick*. *Id.* at 1342 n.3.

On the other hand, the Tenth Circuit has treated candidacy as protected political speech related to matters of public concern and, accordingly, applied the balancing test from *Pickering* and *Connick*. *See Jantzen v. Hawkins*, 188 F.3d 1247, 1257 (10th Cir. 1999) (citing *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971) (The First Amendment's "constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office")).

The Fifth and Seventh Circuits appear to view candidacy as political activity, rather than speech or affiliation, falling somewhere within the spectrum of First Amendment protection. *See Wilbur v. Mahan*, 3 F.3d 214, 219 (7th Cir. 1993) (recognizing the hybrid nature of a case in

5

which a (1) policymaker is fired for (2) speaking out); *Click v. Copeland*, 970 F.2d 106, 111-12 (5th Cir. 1992) ("Our court concluded that cases involving the balance between employees' First Amendment rights and the employer's right to loyal and efficient service could be placed on a continuum."). In the Fifth Circuit, retaliation for this political activity is subject to analysis under *Pickering* and *Connick*. *See Click*, 970 F.2d at 111-13. But, the Seventh Circuit, in recognizing the hybrid nature of running for office, has drawn from both lines of cases in addressing a candidacy dismissal. *See Wilbur*, 3 F.3d at 217-19.

The Sixth Circuit has gone even farther and taken candidacy entirely out of the First Amendment's realm of protection. In a very similar case to the one before this court, the Sixth Circuit found both lines of cases inapplicable because the facts did not present a patronage discharge invoking *Elrod* and *Branti* or denial of a government benefit on a basis that infringed the employee's constitutionally protected interests. *See Carver v. Dennis*, 104 F.3d 847, 850-52 (6th Cir. 1997). Rather, the facts suggested that the employee was fired solely for "trying to take the job of her employer," and, thus, did not implicate the First Amendment at all.[2] *Id.* at 852-53. Thus, the court held that "no reading of the First Amendment required [the employer] to retain [the employee] after [the employee] announced her intention to run against [the employer] for [the employer's] office. To hold otherwise . . . would be to read out of the entire line of relevant Supreme Court precedent the factual requirements of political belief, expression and affiliation, partisan political activity, or expression of opinion, and to read into that precedent a fundamental right to candidacy." *Id.* at 853.

The Fourth Circuit has not had the opportunity to address the specific question of whether a public employee has a First Amendment right to run against her boss in an election and retain

---

[2] In *Myers v. Dean*, the Southern District of Ohio, facing similar facts as this case, relied on this precedent in finding that another deputy clerk had no constitutional right to run against her employer and retain her employment. No. 2:04 cv 00654, 2006 WL 689086 (S.D. Ohio Mar. 16, 2006).

her employment, but the court takes guidance from this circuit's other political speech and affiliation cases.

Most recently, the Fourth Circuit recognized the "right of an [Assistant District Attorney ("ADA")] running for public office not to be fired for speaking publicly in his capacity as a candidate on matters of public concern when the speech is critical of a program that substantially reduces the [District Attorney's ("DA")] office's caseload but there is no reason to believe the speech will negatively impact the DA's office's efficiency." *Smith v. Gilchrist*, 749 F.3d 302, 312 (4th Cir. 2014). In *Gilchrist*, an ADA, running for a county district court judge position, gave an interview as part of his campaign criticizing a program that greatly benefited the DA's office. *Id.* at 305. The DA fired the ADA shortly after the interview and the ADA brought an action alleging a First Amendment violation. *Id.* at 305-06. The court analyzed the facts under *Pickering* and *Connick*, but in the midst of this analysis, noted that "[c]ertain public employees' positions' functions are such 'that party affiliation or political allegiance is an appropriate requirement for the effective performance of the public office involved'" and that "[s]uch employees may be terminated for speech constituting political disloyalty to their employers." *Id.* at 310 n.6 (quoting *Bland v. Roberts*, 730 F.3d 368, 374-75 n.5 (4th Cir. 2013)).

In *Bland v. Roberts*, the Fourth Circuit found that the First Amendment protected several sheriff's deputies from retaliation for supporting the sheriff's political opponent. 730 F.3d at 387. There, the plaintiffs brought both free association and free speech claims. The Fourth Circuit analyzed these claims separately, but in stating the relevant legal standards, recognized the confluence of the two lines of cases. *Id.* at 347 (noting that "'a public employee who has a confidential, policymaking, or public contact role and speaks out in a manner that interferes with or undermines the operation of the agency, its mission, or its public confidence, enjoys

7

substantially less First Amendment protection than does a lower level employee,'" and that "'[t]his principle tends to merge with the established jurisprudence governing the discharge of public employees because of their political beliefs and affiliation.'" (quoting *McVey v. Stacy*, 157 F.3d 271, 278 (4th Cir. 1998))).

The court believes the right asserted in this case exists in that confluence. Here, a public employee in a confidential, policymaking, or public contact role has spoken out as a private citizen on a matter of public concern,[3] but in a manner that communicated a lack of political loyalty to her employer and could interfere with or undermine the operation of the agency.[4]

Under either *Elrod/Branti* or *Pickering/Connick*, the public employee's role within her office and the official duties of her position heavily impact the court's analysis. Lawson was appointed by Gault as a deputy clerk of court. In South Carolina, a deputy clerk of court serves at the pleasure of the clerk of court and during her appointment, may do and perform any and all duties appertaining to the office of the clerk. The clerk of court is answerable for the neglect of duty or misconduct in the office of his deputy. S.C. Code Ann. 14-17-60 (1976). As deputy clerk of court and supervisor within the family court division of the clerk's office, Lawson held a position of confidence and authority as the direct representative of the clerk.

Further, the family court, and by extension, the employees of the clerk of court, deal with emotional, volatile and intimate issues involving domestic and family relationships, including

---

[3] Lawson was suspended from employment with the clerk's office throughout her campaign and it is well-established that public elections are matters of public concern. *See, e.g.*, *Urofsky v. Gilmore*, 216 F.3d 401, 406-07 (4th Cir. 2000) (en banc) ("Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community.").

[4] While Lawson may correctly assert that Gault has not proven that her candidacy caused office discord, the court "do[es] not require the public employer to prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was 'reasonably to be apprehended.'" *Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992) (quoting *Jurgensen v. Fairfax Cnty.*, 745 F.2d 868, 879 (4th Cir. 1984)). Here, the potential for disruption was self-evident and, as this circuit has noted, a public office "would be unmanageable if its head had to . . . retain his political enemies . . . in positions of confidence or in positions in which they would be making policy or, what amounts to the same thing, exercising discretion in the implementation of policy." *Jenkins v. Medford*, 119 F.3d 1156, 1163 n.47 (4th Cir. 1997) (en banc).

those relating to minor children.[5]  And, persons desiring relief from the family court must first seek assistance from the clerk of court.  All pleadings and petitions seeking relief from the family court must first be filed with the clerk of court.  Rule 6, SCRFC.  The delicate, sensitive and personal nature of the matters heard by the family court requires special handling and care of its records and proceedings, as well as those persons who seek its assistance.

As the initial point of contact with the family court, employees of the clerk must be vigilant, attentive, and work in harmony for the benefit of the public they serve. The Supreme Court of South Carolina has adopted policies and procedures which must be followed by the Clerks of Court and their employees in dealing with such matters. Administrative Order Adopting Clerk of Court Manual Revision, S.C. Sup. Ct. Administrative Order No. 2014-05-21-01, dated May 21, 2014.  Accordingly, the Clerk of Court Manual contains a section titled Public Relations.  That section states:

> "Public Relations" is the technique of developing and keeping goodwill with the people you serve. Being aware of how the clerk's office, and the judicial system in general, is perceived by lawyers, lay persons and even other government entities and professional organizations, is primary to maintaining good public relations.
>
> Individuals have various responses to the court system: fear, awe, hostility, respect, indifference, and confusion. Providing assistance and instruction in a professional and pleasant manner creates not

---

[5] The family court has jurisdiction to hear and determine issues relating to divorce, child custody, child and spousal support, abuse and neglect of minor children, termination of parental rights, adoption, and juvenile delinquency. S.C. Code Ann. § 63-3-510 (2008).  Many family court filings are confidential by law and records must be kept in secure locations with controlled access.  For example, an unemancipated minor who lacks consent from a parent or legal guardian must file a petition with the clerk of court to obtain judicial consent before receiving an abortion.  The clerk is required to process the application timely and confidentially, and utilize procedures to protect the anonymity of the petitioner.  S.C. Code Ann. § 44-41-32 (1990).  In addition, cases involving alleged violations of state law by minors are confidential. S.C. Code Ann. § 63-19-2040 (2008).  All documents and records pertaining to termination of parental rights are confidential. *Id.* § 63-7-2600.  All papers and records concerning an adoption are confidential from the time of filing with the clerk of court, and no person may have access to the records except by order of the court.  *Id.* § 63-9-780(B).  It is unlawful for a person having custody or access to certain adoption records to disseminate or permit dissemination of information contained in them without authorization.  A person who violates this requirement is guilty of a misdemeanor and may be punished by fine and/or imprisonment. *Id.* § 63-9-780(F)(1), (2).  The clerk of court is also responsible for the collection and disbursement of child support, which in Union County, averages in excess of $ 300,000.00 per month. (*See* Gault dep., ECF No. 26-5, p. 30).

> only a positive public image, it also creates an atmosphere of cooperation.

Clerk of Court Manual § 1.21 "Public Relations," *available at* http://www.judicial.state.sc.us/clerkOfCourtManual/displaychapter.cfm?chapter=1#1.21. Thus, Lawson's duties undoubtedly resembled those of "a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation [or political allegiance] is an equally appropriate requirement." *Stott v. Haworth*, 916 F.2d 134, 142 (4th Cir. 1990).[6]

Moreover, in Union County, the clerk of court's office is in two separate locations. The family court division is located approximately one-half mile from the main office where the Clerk of Court's primary office is located. Because the offices are not located in the same building, the Clerk of Court is required to impart even more trust in his deputy clerk of court than is usually required.

Accordingly, the court finds that Lawson did not have a First Amendment right to continued employment as deputy clerk of court after she challenged her boss, the clerk of court, in an election for his job.[7]

## CONCLUSION

After a thorough review of the record and for the reasons stated above, Gault's motion for reconsideration (ECF No. 39) and motion for summary judgment or, in the alternative, to dismiss (ECF No. 26) are **GRANTED**.

**IT IS SO ORDERED.**

---

[6] In addition, the court notes that public confidence in the integrity and efficiency of the Union County Clerk of Court was especially important in light of the resignation of the previous clerk, who was indicted and convicted of embezzlement of public funds prior to Gault's appointment, and the resulting investigations and audits that followed.

[7] Having determined that Gault did not violate Lawson's constitutional rights when he fired her, the court finds it unnecessary to address Gault's Qualified Immunity and Eleventh Amendment arguments. (ECF No. 26-2, pp. 8-13.)

s/Timothy M. Cain<br>United States District Judge

Anderson, South Carolina
November 14, 2014